UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JANE DOE (B.C.),<br><br>    Plaintiff,<br><br>    -vs-<br><br>MAYURI INN, INC., a Florida corporation, d/b/a Comfort Inn Bradenton North I-75; G6 HOSPITALITY PROPERTY LLC, a foreign limited liability company, d/b/a Motel 6 Bradenton, FL; D&K INVESTMENT LLC, a Florida limited liability company, d/b/a Sleep Inn Sarasota North; and SAKARDEV LLC, a Florida limited liability company, d/b/a Days Inn by Wyndham Bradenton I-75,<br><br>    Defendants. | CASE NO.: 8:26-cv-586<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**COMES NOW**, Plaintiff, JANE DOE (B.C.), by and through her undersigned counsel, hereby brings this complaint for damages against Defendants, MAYURI INN, INC. ("Mayuri Inn"), a Florida corporation, doing business as Comfort Inn Bradenton North I-75 ("Comfort Inn Bradenton"), G6 HOSPITALITY PROPERTY LLC ("G6 Hospitality"), a foreign limited liability company, doing business as Motel 6 Bradenton, FL ("Motel 6 Bradenton"), D&K INVESTMENT LLC ("D&K"), a Florida limited liability company, doing business as Sleep Inn Sarasota North ("Sleep

1

Inn Sarasota"), and SAKARDEV LLC ("Sakardev"), a Florida limited liability company, doing business as Days Inn by Wyndham Bradenton I-75 ("Days Inn Bradenton"), and states as follows:

## INTRODUCTION

1.     This is an action against Mayuri Inn, G6 Hospitality, D&K, and Sakardev, who owned and operated public lodging establishments known as Comfort Inn Bradenton, Motel 6 Bradenton, Sleep Inn Sarasota, and Days Inn Bradenton, respectively.

2.     Each of the Defendants participated in a venture and received a financial benefit, respectively, while Defendants knew or should have known, based on a combination of well-documented indicators, that sex trafficking and other criminal activity was occurring, and would continue to occur, on their premises.

3.     Rather than taking timely and effective measures to thwart this epidemic, these establishments and their operators chose to engage in and profit from the open and obvious presence of sex trafficking on their property, enjoying the financial benefit from rooms rented for this explicit and apparent purpose.

4.     Jane Doe (B.C.) was a young female who, at all material times hereto, was addicted to drugs and was being sex trafficked through force and coercion by two men ("Trafficker 1" and "Trafficker 2") at the Comfort Inn Bradenton, Motel 6 Bradenton, Sleep Inn Sarasota, and Days Inn Bradenton.

5.     Jane Doe (B.C.) brings this action for damages against each Defendant pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595.

6.     As a direct and proximate result, Jane Doe (B.C.) has suffered severe physical and/or psychological injuries, financial harm, reputational harm, pain and suffering, emotional distress, and loss of enjoyment of life.

## PARTIES

### A. Plaintiff

7.     Jane Doe (B.C.) is, and was at all material times hereto, an adult and a resident of the State of Florida, and is *sui juris*.

8.     Jane Doe (B.C.) seeks to file this action pseudonymously.

9.     Jane Doe (B.C.) is using a pseudonym because of the highly personal nature of her victimization and because of the serious risk of harm to which she would be exposed by her former traffickers and their criminal associates if she brought this suit in her actual name.

10.     Jane Doe (B.C.)'s former trafficker(s) were violent, using physical abuse and threats of abuse as a means to force Plaintiff's compliance with their demands.

11.     Jane Doe (B.C.)'s rights to privacy and security outweigh the public interest in knowing her identification.

12.     Jane Doe (B.C.)'s legitimate privacy and security concerns also outweigh any prejudice potentially caused to Defendants by allowing Jane Doe (B.C.) to proceed pseudonymously.

### B. Defendants

13.    At all times material hereto, MAYURI INN, INC., a Florida corporation with a principal place of business located at 580 66th Street Ct. E., Bradenton, FL 34208, owned, operated, managed, maintained, possessed, controlled, and was doing business as Comfort Inn Bradenton, which was located at 580 66th St Ct E, Bradenton, FL 34208.

14.    At all times material hereto, G6 HOSPITALITY PROPERTY LLC, a foreign limited liability company with a principal place of business located at 4001 International Pkwy., Carrollton, TX 75007, owned, operated, managed, maintained, possessed, controlled, and was doing business as Motel 6 Bradenton, which was located at 660 67th Street Cir. E., Bradenton, FL 34208.

15.    At all times material hereto, D&K HOTEL INVESTMENT LLC, a Florida limited liability company with a principal place of business located 900 University Pkwy, Sarasota, FL 34234, owned, operated, managed, maintained, possessed, controlled, and was doing business as Sleep Inn Sarasota, which was located at  900 University Pkwy., Sarasota, FL 34234.

16.    At all times material hereto, SAKARDEV LLC, a Florida limited liability company with a principal place of business located at 30307 Coretz Blvd., Brooksville, FL 34602 owned, operated, managed, maintained, possessed, controlled, and was doing business as Days Inn Bradenton, which was located at 644 67th Street Cir. E., Bradenton, FL 34208.

**JURISDICTION & VENUE**

17.     This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Jane Doe (B.C.) brings this action under 18 U.S.C. § 1595.

18.     This Court has personal jurisdiction over this matter because the are located within the Middle District of Florida.

19.     Venue is proper in this District, pursuant to 28 U.S.C. § 1361, because all of the events or omissions giving rise to the claims asserted in this action, including each of the Defendant's misconduct and omissions, occurred in the Middle District of Florida.

**FACTUAL ALLEGATIONS**

**I.     HOTEL INDUSTRY'S ROLE IN SEX TRAFFICKING AND THE DEFENDANTS' KNOWLEDGE OF THE PROBLEM**

20.     It is widely known that sex trafficking largely takes place within the hotel industry.  Today, sex trafficking is pervasive in the United States, and hotels are the primary place where it happens.[1] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[2]

---

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council).

[2] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

21.     In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3]

22.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

23.     Nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically starting in 2010 with the Department of Homeland Security's ("DHS") Blue Campaign.[4]   Despite the two campaigns releasing online resources and toolkits and making them publicly accessible to any entity concerned with human trafficking, the hotel industry continued to intentionally avoid training and awareness while benefitting from what they knew or should have known were commercial sex acts of a minor or of an adult induced by force, fraud, or coercion.

24.     Multiple agencies and organizations who actively combat sex trafficking, including the DHS, the National Center for Missing and Exploited Children

---

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf.

[4] *DHS Blue Campaign Five Year Milestone*, Department of Homeland Security (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

("NCMEC"), the Polaris Project, the Florida Attorney General, the Florida Restaurant and Lodging Association ("FRLA"), EPCAT, United Abolitionists, and others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[5]

25.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, of which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

a. Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals showing signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lacking freedom of movement or are constantly monitored;

---

[5] See, e.g., Department of Homeland Security, *Blue Campaign Toolkit,* available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Florida Restaurant and Lodging Association, *Human Trafficking Compliance*, available at: https://frla.org/human-trafficking/; Polaris Project, *Recognizing Human Trafficking*, available at: https://polarisproject.org/recognizing-human-trafficking.

f.  Individuals avoiding eye contact and interaction with others;

g.  Individuals having no control over or possession of money or ID;

h.  Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals having few or no personal items—such as no luggage or other bags;

j.  Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appearing to be traveling with a male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[6]

26.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained owners, operators, managers, employees, staff and/or agents of the establishment.

27.    Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From

---

[6] *Id.*

check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

28.   The relationship between a "pimp" and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subjected to force, fraud, or coercion.  It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

29.   The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of a commercial sex act. Through appropriate training, any owner, operator, manager, employee, or staff member of a hotel or motel would understand the practical and legal association between commercial sex and sex trafficking in a hotel environment.[7] Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.

30.   All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

---

[7] *See Id.*

31. The most effective weapon against sexual exploitation and human trafficking is education and training.[8]

32. As ECPAT concluded:

> "*The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.*"[9]

33. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association (AHLA):

> "*Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.*"[10]

34. Given the prevalence of human trafficking in hotels and motels, and the abundance of information about how franchisors, owners, operators, managers, and hotel employees/staff members can identify and respond to trafficking, it has become apparent that the decision of a hotel to continue generating revenue from

---

[8] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking.

[9] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training. *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry,* J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[10] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking.

traffickers without taking reasonable steps to identify and prevent trafficking in its establishment is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

35. Each of the Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

36. Unfortunately for Jane Doe (B.C.), each Defendant has failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing sex trafficking in their establishments. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (B.C.).

## II.   MAYURI INN d/b/a COMFORT INN BRADENTON

### A. Comfort Inn Bradenton is an Innkeeper

37. Comfort Inn Bradenton is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes, and therefore, the operators of these establishments are qualified "innkeepers" under Florida law.

38. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

39. An innkeeper's knowledge of prior criminal activity on or around the grounds of its establishment imposes a duty to take adequate security precautions for the safety of guests and their property.

11

40. The relevant premises include the front lobby, common areas, walkways, stairwells, private rooms, designated parking area, and curtilage.

## B. Comfort Inn Bradenton Created an Environment that Enabled and Facilitated Sex Trafficking

41. Comfort Inn Bradenton's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Comfort Inn Bradenton has known, since well before Jane Doe (B.C.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

42. Upon information and belief, Comfort Inn Bradenton was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

43. Upon information and belief, at all times material hereto, Comfort Inn Bradenton did not adequately train their staff on sex trafficking detection and prevention.

44. Further, upon information and belief, Comfort Inn Bradenton did not adequately train their staff to identify red flags, such as victims' distressed appearances, unusual payment methods, or high foot traffic to rooms, nor were they instructed to report suspicions to law enforcement.

45. Upon information and belief, at all times material hereto, Comfort Inn Bradenton did not develop or implement sufficient procedures, protocols, or standards to detect and/or deter sex trafficking on their premises.

46. Comfort Inn Bradenton had housekeepers that went room to room, but

allowed clients to refuse housekeeping services, even for extended periods of time.

47.    Housekeeping allowed the same individuals that refused to allow housekeeping in their rooms to exchange linens in the hallway.

48.    Comfort Inn Bradenton had clients that paid in cash on a daily basis.

49.    Comfort Inn Bradenton had clients that were scantily clad so that it appeared they were engaged in commercial sex.

50.    Comfort Inn Bradenton was known to be located in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to prostitution activity.

51.    The property layout had one entrance for vehicles to drive onto the property. Therefore, every separate car that drove onto the property drove past the front office before they could drive around to park in front of any room, giving the front desk staff a clear view of who was entering and leaving their property and allowing the staff to avoid being unaware of any visitor on property, as is visible from this picture of the property from 2016:



52.    The property had a fence perimeter which blocked off the back and both sides, preventing anyone from entering by any direction other than the front.



53.    Upon information and belief, there was no security personnel at the Comfort Inn Bradenton.

54.    Comfort Inn Bradenton had security cameras which faced the parking lot and common areas, giving the front office additional eyes on the property.

55.    "Budget establishments" like Comfort Inn Bradenton, situated near interstate highways for easy access and egress, are known hotspots for trafficking, yet Defendants failed to invest in security personnel or anti-trafficking protocols.

56.    Comfort Inn Bradenton was located near I-75, a highway.

57.    Comfort Inn Bradenton encouraged discretion to maintain occupancy rates.

58.    Comfort Inn Bradenton encouraged, promoted, and facilitated an environment where many of the hotel guests would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

## C. The Sex Trafficking of Jane Doe (B.C.) Occurred at Comfort Inn Bradenton.

59.    Between mid-March 2016 through June or July of 2016, Jane Doe (B.C.) was at Comfort Inn Bradenton numerous times, where she would stay for a few days at a time, but returned frequently enough that the hotel front desk came to recognize her.

60.    Trafficker 1 selected this motel because Comfort Inn Bradenton would allow his trafficking activities to occur without reporting him, interfering, or stopping the criminal activity.

61.    During each stay at the Comfort Inn Bradenton, Jane Doe (B.C.) was forced and/or coerced by Trafficker 1 to engage in commercial sex acts with multiple sex buyers.

62.    The room was rented by Trafficker 1, Jane Doe (B.C.), and/or his associates.

63.    They rented a room with two beds – one bed for engaging on commercial sex acts and the other bed for sleeping.

64.    Initially the room was rented with cash, a prepaid Visa card, or a Greendot card.

65.    They were allowed to renew their room daily and paid in cash daily after the first day.

66.    No credit card was required.

67.    Upon information and belief, after observing Jane Doe (B.C.), Trafficker 1, and the other girl with him, the hotel staff identified that they were engaged in commercial sex and illegal activity and located them at the back of the hotel to assist Trafficker 1 with maintaining discretion.

68.    Jane Doe (B.C.) carried a laundry basket with all her belongings in it; she appeared to be homeless.

69.    Trafficker 1 and his associates posted numerous, separate advertisements featuring Jane Doe (B.C.) on Backpage.com[11] to attract buyers to Comfort Inn Bradenton.

70.    Trafficker 1 enforced a strict pricing structure for commercial sex acts and

---

[11] Backpage.com was an online website that was known as a marketplace for commercial sexual activity and was known for facilitating sex trafficking. The FBI seized the domain and shut down the website April 6, 2018. *See* Dep't of Justice, Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment (Apr. 9, 2018), available at https://www.justice.gov/archives/opa/pr/justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads.

set the prices that Jane Doe (B.C.) was to charge for each act.

71.    Each "date" involved a male buyer entering the property by driving past the front office without checking in, proceeding to Jane Doe (B.C.)'s room and parking in front of it for a short time interval, engaging in commercial sex acts, and then departing immediately thereafter.

72.    Trafficker 1 would routinely bang on the door and scream at Jane Doe (B.C.) to end "dates" going too long.

73.    Immediately after each "date," Trafficker 1 or one of his associates would enter the room to collect any money or Jane Doe (B.C.) would exit the room to provide Trafficker 1 or his associate the money; this pattern was one that should have been obvious to hotel owners, operators, managers, employees, or staff.

74.    After witnessing clear and tell-tale signs of commercial sexual activity and sex trafficking taking place, the Comfort Inn Bradenton affirmatively elected to stand aside, not call the police, and not interfere or get in the way of the sex trafficking activities so that they could continue to reap the ongoing and continuous room reservation fees.

75.    Jane Doe (B.C.) was heavily addicted to opiates and knew what it felt like to be "dope sick" while experiencing withdrawal symptoms.

76.    Jane Doe (B.C.) was visibly under the influence of drugs while in the common areas and around staff at Comfort Inn Bradenton.

77.    Jane Doe (B.C.) was expected to earn a set amount of money each day.

78.    Trafficker 1 preyed on Jane Doe (B.C.)'s fear of experiencing withdrawal

symptoms to threaten, force, and coerce Jane Doe (B.C.)'s obedience.

79.    Trafficker 1 repeatedly mandated that Jane Doe (B.C.) earn enough money for him before he would give her the drug dose that would prevent her from becoming "dope sick" – ensuring compliance with his demands by withholding or threatening to withhold drugs.

80.    Trafficker 1 forced and coerced Jane Doe (B.C.)'s compliance through multiple methods, including physical violence and beatings of Jane Doe (B.C.), sexual assault by forced oral and vaginal penetration of Jane Doe (B.C.) by Trafficker 1, threats of violence against Jane Doe (B.C.) and her family, constant supervision by Trafficker 1's bottom girl and other associates, and exploitation of her heroin, meth, and pills addiction.

81.    During her time at Comfort Inn Bradenton, Jane Doe (B.C.) exhibited numerous signs of trafficking that should have been apparent to staff, including:

     a.  visible signs of physical abuse to Jane Doe (B.C.);

     b.  constant presence of controlling individuals around Jane Doe (B.C.);

     c.  multiple male visitors throughout the day and night;

     d.  short-duration visits by different men;

     e.  Trafficker entering her room to collect the money between each "date";

     f.  Trafficker banging on door and screaming at her to be done when "date" took too long;

g.  payment in cash;

h.  Jane Doe (B.C.) was clearly addicted to and using drugs;

i.  constant smell of drugs in the common areas around the establishment;

j.  extended stay with minimal personal belongings that she carried around in a laundry bin; and

k.  restricted movement and constant supervision of Jane Doe (B.C.).

82.    Additionally, the housekeeping staff encountered rooms littered with condom wrappers, lubricants, and drug paraphernalia each time that Jane Doe (B.C.) and Trafficker 1 left.

83.    The next time they returned, they were permitted to rent a room.

84.    The housekeeping staff's observations of the byproducts of commercial sex were present each time they rented a room, yet they were never turned away, limited, or stopped.

85.    If anything, the hotel continued to assist them by continually placing them in the back of the motel to avoid detection.

86.    Nevertheless, despite Jane Doe (B.C.)'s visible bruises, emaciated state, revealing attire, and the constant parade of male visitors, the owner, manager, operator, employees, staff, and agents of Comfort Inn Bradenton never called the police, nor did they take any steps to assist Jane Doe (B.C.) in any capacity.

## III.    G6 HOSPITALITY PROPERTY LLC d/b/a MOTEL 6 BRADENTON

### A. Motel 6 Bradenton is an Innkeeper

87. Motel 6 Bradenton is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes, and therefore, the operators of these establishments are qualified "innkeepers" under Florida law.

88. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

89. An innkeeper's knowledge of prior criminal activity on or around the grounds of its establishment imposes a duty to take adequate security precautions for the safety of guests and their property.

90. The relevant premises include the front lobby, common areas, walkways, stairwells, private rooms, designated parking area, and curtilage.

**B. Motel 6 Bradenton Created an Environment that Enabled and Facilitated Sex Trafficking**

91. Motel 6 Bradenton's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Motel 6 Bradenton has known, since well before Jane Doe (B.C.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

92. Upon information and belief, Motel 6 Bradenton was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

93. Upon information and belief, at all times material hereto, Motel 6 Bradenton did not adequately train their staff on sex trafficking detection and prevention.

20

94.    Further, upon information and belief, Motel 6 Bradenton did not adequately train their staff to identify red flags, such as victims' distressed appearances, unusual payment methods, or high foot traffic to rooms, nor were they instructed to report suspicions to law enforcement.

95.    Upon information and belief, at all times material hereto, Motel 6 Bradenton did not develop or implement sufficient procedures, protocols, or standards to detect and/or deter sex trafficking on their premises.

96.    Motel 6 Bradenton had housekeepers that went room to room, but allowed clients to refuse housekeeping services, even for extended periods of time.

97.    Housekeeping allowed the same individuals that refused to allow housekeeping in their rooms to exchange linens in the hallway.

98.    Motel 6 Bradenton had clients that paid in cash on a daily basis.

99.    Motel 6 Bradenton had clients that were scantily clad so that it appeared they were engaged in commercial sex.

100.    Motel 6 Bradenton was known to be located in a high prostitution area and was known to those engaged in commercial sex to be a location that was open to prostitution activity.

101.    The property layout had one entrance for vehicles to drive onto the property.  Therefore, every separate car that drove onto the property drove past the front office before they could drive around to park in front of any room, giving the front desk staff a clear view of who was entering and leaving their property and allowing the staff to avoid being unaware of any visitor on property, as is visible from

this picture of the property from 2016:



102. The property had a fence perimeter which blocked off the back and both sides, preventing anyone from entering by any direction other than the front entrance.

103. Upon information and belief, there was no security personnel at the Motel 6 Bradenton.

104. The sex trafficking problem was so apparent that the hotel reviews online even discussed the sexualized atmosphere, the prevalence of commercial sex, and the ongoing drug and criminal activity.

105. Upon information and belief, Motel 6 Bradenton was aware of the reviews and its reputation.

106. "Budget establishments" like Motel 6 Bradenton, situated near interstate highways for easy access and egress, are known hotspots for trafficking, yet Defendants failed to invest in security personnel or anti-trafficking protocols.

107. Motel 6 Bradenton was located near I-75, a highway.

22

108. Motel 6 Bradenton encouraged discretion to maintain occupancy rates.

109. Motel 6 Bradenton encouraged, promoted, and facilitated an environment where many of the hotel guests would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

**C. The Sex Trafficking of Jane Doe (B.C.) Occurred at Motel 6 Bradenton.**

110. From March 12, 2016, through July 23, 2016, Trafficker 1 forced or coerced Jane Doe (B.C.) into commercial sex trafficking at Motel 6 Bradenton.

111. Trafficker 1 selected this motel because Motel 6 Bradenton would allow his trafficking activities to occur without reporting him, interfering, or stopping the criminal activity.

112. The room was rented by Trafficker 1, Jane Doe (B.C.), or his associates.

113. They rented a room with two beds – one bed for engaging on commercial sex acts and the other bed for sleeping.

114. Initially the room was rented with cash, a prepaid Visa card, or a Greendot card.

115. They were allowed to renew their room daily and paid in cash daily after the first day.

116. During this period, Trafficker 1 and his associates posted several advertisements featuring Jane Doe (B.C.) on Backpage.com.

117. Trafficker 1 paid cash for rooms on the back side of the property, with specific rules imposed and enforced by the front desk staff, including having rooms away from the lobby to avoid detection and partitioning away from families.

118.    Trafficker 1 used extreme violence against Jane Doe (B.C.) regularly to enforce compliance with his demands.

119.    Trafficker 1 and Jane Doe (B.C.) stayed at various other hotels and motels where Trafficker 1 would inflict violence on Jane Doe (B.C.) and the hotel would hear her screaming, intervene, and either call the police or ask them to leave.

120.    At Motel 6 Bradenton however, Trafficker 1 inflicted the same level of violence against Jane Doe (B.C.), causing screaming, but no assistance or intervention occurred.

121.    Trafficker 1 maintained constant supervision over Jane Doe (B.C.) at Motel 6 Bradenton, using various methods of control, including physical violence, threats against Jane Doe (B.C.) and her family, exploitation of her drug dependency through controlled drug supply, and coordination with co-conspirators in an enterprise involving multiple females.

122.    Additionally, Trafficker 1 would routinely bang on doors to end "dates" going too long.

123.    After witnessing clear and tell-tale signs of commercial sexual activity and sex trafficking taking place, the Motel 6 Bradenton affirmatively elected to stand aside, not call the police, and not interfere or get in the way of the sex trafficking activities so that they could continue to reap the ongoing and continuous room reservation fees.

124.    During her time at Motel 6 Bradenton, Jane Doe (B.C.) exhibited numerous signs of trafficking that should have been apparent to staff, including:

    a. visible signs of physical abuse to Jane Doe (B.C.);

    b. constant presence of the same controlling individuals around Jane Doe (B.C.);

    c. multiple male visitors entering through the back;

    d. short-duration visits by different men;

    e. payment in cash, including extra tips per date to the front desk;

    f. Jane Doe (B.C.) was clearly addicted to and using drugs;

    g. restricted hours and movement enforced by the staff;

    h. extended stay with minimal personal belongings that she carried around in a laundry bin; and

    i. no housekeeping by design.

125. Additionally, the housekeeping staff regularly encountered rooms smelling strongly of marijuana and the rooms contained drug paraphernalia and a large quantity of used condoms after Trafficker 1 and Jane Doe (B.C.) vacated the premise. Nonetheless, they were allowed to rent again on their next return to the property.

126. Nevertheless, despite Jane Doe (B.C.)'s visible bruises, drugged appearance, lack of belongings, and up to twenty male visitors a day, G6 Hospitality and the staff at Motel 6 Bradenton failed to ever call the police on Trafficker 1, nor did they take any steps to assist Jane Doe (B.C.) in any capacity.

IV.   **D&K INVESTMENT LLC d/b/a SLEEP INN SARASOTA**

**A. Sleep Inn Sarasota is an Innkeeper**

25

127. Sleep Inn Sarasota is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes, and therefore, the operators of these establishments are qualified "innkeepers" under Florida law.

128. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

129. An innkeeper's knowledge of prior criminal activity on or around the grounds of its establishment imposes a duty to take adequate security precautions for the safety of guests and their property.

130. The relevant premises include the front lobby, common areas, walkways, stairwells, private rooms, designated parking area, and curtilage.

## B. Sleep Inn Sarasota Created an Environment that Enabled and Facilitated Sex Trafficking

131. Sleep Inn Sarasota's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Sleep Inn Sarasota has known, since well before Jane Doe (B.C.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

132. Upon information and belief, Sleep Inn Sarasota was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

133. Upon information and belief, at all times material hereto, Sleep Inn Sarasota did not adequately train their staff on sex trafficking detection and prevention.

134. Further, upon information and belief, Sleep Inn Sarasota did not adequately train their staff to identify red flags, such as victims' distressed appearances, unusual payment methods, or high foot traffic to rooms, nor were they instructed to report suspicions to law enforcement.

135. Upon information and belief, at all times material hereto, Sleep Inn Sarasota did not develop or implement sufficient procedures, protocols, or standards to detect and/or deter sex trafficking on their premises.

136. Sleep Inn Sarasota had housekeepers that went room to room, but allowed clients to refuse housekeeping services, even for extended periods of time.

137. Housekeeping allowed the same individuals that refused to allow housekeeping in their rooms to exchange linens in the hallway.

138. Sleep Inn Sarasota had clients that paid in cash on a daily basis.

139. Sleep Inn Sarasota had clients that were scantily clad so that it appeared they were engaged in commercial sex.

140. The property layout had one entrance for vehicles to drive onto the property. Therefore, every separate car that drove onto the property drove past the front office, parked, and had to walk through the front lobby to get to a room.



141. Upon information and belief, there was no security personnel at the Sleep Inn Sarasota.

142. The sex trafficking problem was so apparent that the hotel reviews online even discussed the sexualized atmosphere, the prevalence of commercial sex, and the ongoing drug and criminal activity.

143. Upon information and belief, Sleep Inn Sarasota was aware of the reviews and its reputation.

144. "Budget establishments" like Sleep Inn Sarasota, situated near highways for easy access and egress, are known hotspots for trafficking, yet Defendants failed to invest in security personnel or anti-trafficking protocols.

145. Sleep Inn Sarasota was located near SR-41.

146. Sleep Inn Sarasota encouraged discretion to maintain occupancy rates.

147. Sleep Inn Sarasota encouraged, promoted, and facilitated an

28

environment where many of the hotel guests would rent rooms for the purpose of using drugs or engaging in commercial sex acts.

**C. The Sex Trafficking of Jane Doe (B.C.) Occurred at Sleep Inn Sarasota.**

148. Separately, between March and June 2016, Jane Doe (B.C.) came to the Sleep Inn Sarasota with Trafficker 1 on one or more occasions.

149. Trafficker 1 selected this motel because Sleep Inn Sarasota would allow their respective trafficking activities to occur without reporting, interfering, or stopping criminal activity.

150. While at the Sleep Inn Sarasota, Trafficker 1 was violent to Jane Doe (B.C.).

151. Trafficker 1 and his associate obtained a room with two beds – one bed for engaging on commercial sex acts and the other bed for sleeping.

152. Initially the room was rented with cash, a prepaid Visa card, or a Greendot card.

153. They were allowed to renew their room daily and paid in cash daily after the first day.

154. During this period, Trafficker 1 and his associates posted several advertisements featuring Jane Doe (B.C.) on Backpage.com.

155. Trafficker 1 used extreme violence against Jane Doe (B.C.) regularly to enforce compliance with his demands.

156. Trafficker 1 and Jane Doe (B.C.) stayed at various other hotels and motels where Trafficker 1 would inflict violence on Jane Doe (B.C.) and the hotel

would hear her screaming, intervene, and either call the police or ask them to leave.

157.   At Sleep Inn Sarasota, Trafficker 1 inflicted the same level of violence against Jane Doe (B.C.), causing screaming, but no assistance or intervention occurred.

158.   Trafficker 1 maintained constant supervision over Jane Doe (B.C.) at Sleep Inn Sarasota, using various methods of control, including physical violence and exploitation of her drug dependency through controlled drug supply.

159.   Briefly, Jane Doe (B.C.) was on the run from Trafficker 1 in an effort to escape his violence.

160.   During this small window of time, she encountered Trafficker 2.

161.   In late June 2016, Trafficker 2 forced or coerced Jane Doe (B.C.) into commercial sex trafficking at Sleep Inn Sarasota.

162.   Trafficker 2 rented two rooms with Jane Doe (B.C.) and other victims (including a juvenile) who were exhibiting signs of fear, withdrawal, abuse, and coercion.

163.   The staff observed multiple victims in distress, including an altercation on or about June 26, 2016 in the lobby where Trafficker 2 grabbed one of the females with him by the throat in the lobby, ordered her to stay in the lobby, pulled the car around to the front of the lobby, and ordered her into the car.  In the car, he punched her in the face.

164.   After witnessing clear and tell-tale signs of commercial sexual activity and sex trafficking taking place, the Sleep Inn Sarasota affirmatively elected to stand

aside, not call the police, and not interfere or get in the way of the sex trafficking activities so that they could continue to reap the ongoing and continuous room reservation fees.

165. Because of this incident, the hotel front desk wrote a memo stating that Trafficker 2 was a "pimp" so that a room would not be rented to him in the future.



166. Upon information and belief, this was only written and saved because the police came by asking questions several days after the incident.

167. During her time at Sleep Inn Sarasota, Jane Doe (B.C.) exhibited numerous signs of trafficking that should have been apparent to staff, including:

    a.  visible signs of physical abuse to Jane Doe (B.C.);

    b.  constant presence of the same controlling individuals around Jane Doe (B.C.);

    c.  multiple male visitors entering through the back;

    d.  short-duration visits by different men;

    e.  payment in cash, including extra tips per date to the front desk;

    f.  Jane Doe (B.C.) was clearly addicted to and using drugs;

    g.  restricted hours and movement enforced by the staff;

    h.  extended stay with minimal personal belongings that she carried around in a laundry bin; and

    i.  no housekeeping by design.

168. The staff observed these indicators but did not report.

169. Surveillance video and guest registry logs confirm Trafficker 2's presence and the trafficking activity on the premises.

170. Nevertheless, despite Jane Doe (B.C.)'s visible bruises, emaciated state, revealing attire, and the constant parade of male visitors, the owner, manager, operator, employees, staff, and agents of Sleep Inn Sarasota never called the police, nor did they take any steps to assist Jane Doe (B.C.) in any capacity.

## V. SAKARDEV LLC d/b/a DAYS INN BRADENTON

### A. Days Inn Bradenton is an Innkeeper

171. Days Inn Bradenton is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes, and therefore, the operators of these establishments are qualified "innkeepers" under Florida law.

172. An innkeeper has a special relationship with its guests which gives rise to a duty to protect them against unreasonable risk of harm.

173. An innkeeper's knowledge of prior criminal activity on or around the grounds of its establishment imposes a duty to take adequate security precautions for the safety of guests and their property.

174. The relevant premises include the front lobby, common areas, walkways, stairwells, private rooms, designated parking area, and curtilage.

### B. Days Inn Bradenton Created an Environment that Enabled and Facilitated Sex Trafficking

175. Days Inn Bradenton's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Days Inn Bradenton has known, since well before Jane Doe (B.C.)'s trafficking, that sex trafficking was ongoing and widespread at its property.

176. Upon information and belief, Days Inn Bradenton was aware of criminal activity occurring at its motel, including commercial sex trafficking and related crimes.

177. Upon information and belief, at all times material hereto, Days Inn Bradenton did not adequately train their staff on sex trafficking detection and prevention.

178. Further, upon information and belief, Days Inn Bradenton did not adequately train their staff to identify red flags, such as victims' distressed appearances, unusual payment methods, or high foot traffic to rooms, nor were they instructed to report suspicions to law enforcement.

179. Upon information and belief, at all times material hereto, Days Inn Bradenton did not develop or implement sufficient procedures, protocols, or standards to detect and/or deter sex trafficking on their premises.

180. Days Inn Bradenton had housekeepers that went room to room, but allowed clients to refuse housekeeping services, even for extended periods of time.

181. Housekeeping allowed the same individuals that refused to allow housekeeping in their rooms to exchange linens in the hallway.

182. Days Inn Bradenton had clients that paid in cash on a daily basis.

183. Days Inn Bradenton had clients that were scantily clad so that it appeared

33

they were engaged in commercial sex.

184. The property layout had one entrance for vehicles to drive onto the property, it looped around the building, and the exit was on the far side. Therefore, every separate car that drove onto the property drove past the front office to park:



185. Upon information and belief, there was no security personnel at the Days Inn Bradenton.

186. "Budget establishments" like Days Inn Bradenton, situated near highways for easy access and egress, are known hotspots for trafficking, yet Defendants failed to invest in security personnel or anti-trafficking protocols.

187. Days Inn Bradenton was located near I-75, a highway.

188. Days Inn Bradenton encouraged discretion to maintain occupancy rates.

189. Days Inn Bradenton encouraged, promoted, and facilitated an environment where many of the hotel guests would rent rooms for the purpose of using

34

drugs or engaging in commercial sex acts.

**C. The Sex Trafficking of Jane Doe (B.C.) Occurred at Days Inn Bradenton.**

190.    From approximately late March to July 2016 intermittently, Trafficker 1 forced or coerced Jane Doe (B.C.) into commercial sex trafficking at Days Inn Bradenton.

191.    Trafficker 1 selected this motel because Days Inn Bradenton would allow their respective trafficking activities to occur without reporting, interfering, or stopping the criminal activity.

192.    While at the Days Inn Bradenton, Trafficker 1 was violent to Jane Doe (B.C.).

193.    Trafficker 1 and his associate obtained a room with two beds – one bed for engaging on commercial sex acts and the other bed for sleeping.

194.    Initially the room was rented with cash, a prepaid Visa card, or a Greendot card.

195.    They were allowed to renew their room daily and paid in cash daily after the first day.

196.    During this period, Trafficker 1 and his associates posted several advertisements featuring Jane Doe (B.C.) on Backpage.com.

197.    Trafficker 1 used extreme violence against Jane Doe (B.C.) regularly to enforce compliance with his demands.

198.    Trafficker 1 and Jane Doe (B.C.) stayed at various other hotels and motels where Trafficker 1 would inflict violence on Jane Doe (B.C.) and the hotel

would hear her screaming, intervene, and either call the police or ask them to leave.

199.   At Days Inn Bradenton, Trafficker 1 inflicted the same level of violence against Jane Doe (B.C.), causing screaming, but no assistance or intervention occurred.

200.   Trafficker 1 maintained constant supervision over Jane Doe (B.C.) at Days Inn Bradenton, using various methods of control, including physical violence and exploitation of her drug dependency through controlled drug supply.

201.   On one occasion, Trafficker 1 scheduled a "date" for Jane Doe (B.C.), but the date stole the money and ran.

202.   Trafficker 1 chased the "date" through the lobby yelling at him that he "took [his] money!"

203.   Jane Doe (B.C.) was beaten as a result of this theft, but the hotel did nothing, despite her screaming.

204.   Trafficker 1 also had an altercation with an associate in the parking lot of Days Inn Bradenton where the associate "bear-maced" him.

205.   Despite Trafficker 1 blaming Jane Doe (B.C.) and screaming at her, Jane Doe (B.C.) ran and got milk to pour on Trafficker 1's head to relieve the effects of the mace.

206.   After witnessing clear and tell-tale signs of commercial sexual activity and sex trafficking taking place, the Days Inn Bradenton affirmatively elected to stand aside, not call the police, and not interfere or get in the way of the sex trafficking activities so that they could continue to reap the ongoing and continuous room

reservation fees.

207. Trafficker 1 used physical violence, sexual assault, threats, and exploitation of Jane Doe (B.C.)'s drug addiction to force and coerce her to engage in commercial sex acts.

208. During her time at Days Inn Bradenton, the staff witnessed signs of Jane Doe (B.C.)'s trafficking, including visible abuse, drugged state, multiple male visitors, short duration stays, cash payments, room evidence of sex and drugs, and restricted movement.

209. During her time at Days Inn Bradenton, Jane Doe (B.C.) exhibited numerous signs of trafficking that should have been apparent to staff, including:

l.  visible signs of physical abuse to Jane Doe (B.C.);

m.  constant presence of controlling individuals around Jane Doe (B.C.);

n.  multiple male visitors throughout the day and night;

o.  short-duration visits by different men;

p.  Trafficker entering her room to collect the money between each "date";

q.  Trafficker banging on door and screaming at her to be done when "date" took too long;

r.  payment in cash;

s.  Jane Doe (B.C.) was clearly addicted to and using drugs;

t.  constant smell of drugs in the common areas around the establishment;

u.  extended stay with minimal personal belongings that she carried around in a laundry bin; and

v.  restricted movement and constant supervision of Jane Doe (B.C.).

210.  Nevertheless, Sakardev and the owner, manager, employee, staff, or agent at Days Inn Bradenton ignored these indicators, failed to ever call the police on Trafficker 1, and did nothing to assist Jane Doe (B.C.) in any capacity.

## VI.    PHYSICAL AND PSYCHOLOGICAL HARM TO PLAINTIFF

211.  As a direct and proximate result of the trafficking that occurred at Defendants' establishments, Jane Doe (B.C.) has suffered, without limitation, severe physical, psychological, financial, and reputational harm.

212.  Jane Doe (B.C.) suffered physical injuries resulting from long term physical abuse and drug use which took place at each of the Defendant's establishments.

213.  Jane Doe (B.C.) suffered and continues to suffer psychological injuries, including but not limited to post-traumatic stress disorder (PTSD), emotional distress, pain and suffering, anxiety disorder, panic attacks, intrusive thoughts, flashbacks, depression, and loss of enjoyment of life.

214.  The harm Jane Doe (B.C.) experienced at the respective establishments owned and operated by Defendants has resulted in lasting psychological damage requiring ongoing therapeutic intervention and psychiatric care; such care is expected to be needed for the rest of her life.

## CAUSES OF ACTION

### COUNT I
### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
*(Jane Doe (B.C.) v. Mayuri Inn)*

215.    Jane Doe (B.C.) realleges and incorporates by reference the allegations contained in paragraphs 1-86, 211-214, as if fully set forth in this Count.

216.    Mayuri Inn knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2), 1595(a), occurring within the territorial jurisdiction of the United States.

217.    Mayuri Inn's conduct was in or affected interstate and/or foreign commerce.

218.    Jane Doe (B.C.) is a sex trafficking victim.

219.    Jane Doe (B.C.)'s trafficker(s) recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Jane Doe (B.C.).

220.    Jane Doe (B.C.) was engaging in commercial sex acts at Comfort Inn Bradenton through force, threats of force, and/or coercion.

221.    Jane Doe (B.C.) was regularly beaten by her trafficker(s) and had visible injuries on her body while at Comfort Inn Bradenton.

222.    Jane Doe (B.C.)'s trafficker(s) used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

223.    All money made by Jane Doe (B.C.) from these commercial sex acts was

39

given to Trafficker 1.

224.  Trafficker 1, his associates, and Mayuri Inn took part in a common undertaking or enterprise involving both risk and potential profit wherein Trafficker 1 and his associates ran a criminal sex trafficking and drug dealing operation out of Comfort Inn Bradenton and Traffickers 1 and Mayuri Inn financially benefited from the same.

225.  Mayuri Inn knowingly received something of value by making money from the room rentals used for trafficking.

226.  Trafficker 1 received something of value in that he received the proceeds of Jane Doe (B.C.)'s commercial sex acts, as well as received a "safe" venue to operate his venture without the risk of Comfort Inn Bradenton calling the police or forcing him to leave the premises.

227.  Jane Doe (B.C.) received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

228.  Mayuri Inn knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 18 U.S.C. §§ 1591(a)(1).

229.  Mayuri Inn rented rooms as needed for commercial sex, despite the obvious signs of sex trafficking, and did not call the police on Trafficker 1 so as not to interfere with the ongoing venture while continuing to reap the profits from the room rentals.

230.  Mayuri Inn's conduct has caused Jane Doe (B.C.) serious harm

including, without limitation, physical, psychological, financial, and reputational harm.

**WHEREFORE**, Plaintiff, Jane Doe (B.C.), demands judgment from Defendant, Mayuri Inn, for compensatory damages, punitive damages, past and future damages, reasonable attorney's fees, costs and expenses of these proceedings, punitive damages, and such other relief as this Court deems just and proper.

## COUNT II
## BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
*(Jane Doe (B.C.) v. G6 Hospitality)*

231.   Jane Doe (B.C.) realleges and incorporates by reference the allegations contained in paragraphs 1-36, 87-126, 211-214, as if fully set forth in this Count.

232.   G6 Hospitality knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2), 1595(a), occurring within the territorial jurisdiction of the United States.

233.   G6 Hospitality's conduct was in or affected interstate and/or foreign commerce.

234.   Jane Doe (B.C.) is a sex trafficking victim.

235.   Jane Doe (B.C.)'s trafficker(s) recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Jane Doe (B.C.)

236.   Jane Doe (B.C.) was engaging in commercial sex acts at Motel 6 Bradenton through force, threats of force, and/or coercion.

237.   Jane Doe (B.C.) was regularly beaten by her trafficker(s) and had visible

injuries on her body while at Motel 6 Bradenton.

238. Jane Doe (B.C.)'s trafficker(s) used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

239. All money made by Jane Doe (B.C.) from these commercial sex acts was given to her trafficker(s).

240. Trafficker 1, his associates, and G6 Hospitality took part in a common undertaking or enterprise involving both risk and potential profit wherein Trafficker 1 and his associates ran a criminal sex trafficking and drug dealing operation out of Motel 6 Bradenton and Traffickers 1 and G6 Hospitality financially benefited from the same.

241. G6 Hospitality knowingly received something of value by making money from the room rentals used for trafficking.

242. Trafficker 1 received something of value in that he received the proceeds of Jane Doe (B.C.)'s commercial sex acts, as well as received a "safe" venue to operate his venture without the risk of Motel 6 Bradenton calling the police or forcing him to leave the premises.

243. Jane Doe (B.C.) received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

244. G6 Hospitality knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 18 U.S.C. §§ 1591(a)(1).

245. G6 Hospitality rented rooms as needed for commercial sex, despite the obvious signs of sex trafficking, and did not call the police on Trafficker 1 so as not to interfere with the ongoing venture while continuing to reap the profits from room rentals.

246. G6 Hospitality's conduct has caused Jane Doe (B.C.) serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**WHEREFORE**, Plaintiff, Jane Doe (B.C.), demands judgment from Defendant, G6 Hospitality, for compensatory damages, past and future damages, reasonable attorney's fees, costs, and expenses of these proceedings, punitive damages, and such other relief as this Court deems just and proper.

## COUNT III
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595**
*(Jane Doe (B.C.) v. D&K)*

247. Jane Doe (B.C.) realleges and incorporates by reference the allegations contained in paragraphs 1-36, 127-170, 211-214, as if fully set forth in this Count.

248. D&K knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2), 1595(a), occurring within the territorial jurisdiction of the United States.

249. D&K's conduct was in or affected interstate and/or foreign commerce.

250. Jane Doe (B.C.) is a sex trafficking victim.

251. Jane Doe (B.C.)'s trafficker(s) recruited, enticed, harbored, transported,

provided, obtained, advertised, maintained, and/or solicited Jane Doe (B.C.)

252. Jane Doe (B.C.) was engaging in commercial sex acts at Sleep Inn Sarasota through force, threats of force, and/or coercion.

253. Jane Doe (B.C.) was regularly beaten by her trafficker(s) and had visible injuries on her body while at Sleep Inn Sarasota.

254. Trafficker 2 was also violent to the other females with him and inflicted violence in common area(s).

255. Jane Doe (B.C.)'s trafficker(s) used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

256. All money made by Jane Doe (B.C.) from these commercial sex acts was given to her traffickers.

257. Trafficker 1, his associates, and D&K took part in a common undertaking or enterprise involving both risk and potential profit wherein Trafficker 1 and his associates ran a criminal sex trafficking and drug dealing operation out of Sleep Inn Sarasota and Traffickers 1 and D&K financially benefited from the same.

258. Trafficker 2, his associates, and D&K took part in a common undertaking or enterprise involving both risk and potential profit wherein Trafficker 2 and his associates ran a criminal sex trafficking and drug dealing operation out of Sleep Inn Sarasota and Traffickers 2 and D&K financially benefited from the same.

259. D&K knowingly received something of value by making money from the room rentals used for trafficking.

44

260. Trafficker 1 received something of value in that they he received the proceeds of Jane Doe (B.C.)'s commercial sex acts, as well as received a "safe" venue to operate his venture without the risk of Sleep Inn Sarasota interfering, calling the police or forcing him to leave the premise.

261. Trafficker 2 received something of value in that they he received the proceeds of Jane Doe (B.C.)'s commercial sex acts, as well as received a "safe" venue to operate his venture without the risk of Sleep Inn Sarasota interfering, calling the police, or forcing him to leave the premise.

262. Jane Doe (B.C.) received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

263. D&K knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 18 U.S.C. §§ 1591(a)(1).

264. D&K rented rooms as needed for commercial sex, despite the obvious signs of sex trafficking, and did not call the police on Trafficker 2 so as not to interfere with the ongoing criminal venture while continuing to reap the profits from room rentals.

265. D&K's conduct has caused Jane Doe (B.C.) serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**WHEREFORE**, Plaintiff, Jane Doe (B.C.), demands judgment from Defendant, D&K, for compensatory damages, past and future damages, reasonable attorney's fees, costs, and expenses of these proceedings, punitive damages, and such other relief as this Court deems just and proper.

## COUNT IV
### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595
*(Jane Doe (B.C.) v. Sakardev)*

266.    Jane Doe (B.C.) realleges and incorporates by reference the allegations contained in paragraphs 1-36, 171-214, as if fully set forth in this Count.

267.    Sakardev knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2), 1595(a), occurring within the territorial jurisdiction of the United States.

268.    Sakardev's conduct was in or affected interstate and/or foreign commerce.

269.    Jane Doe (B.C.) is a sex trafficking victim.

270.    Jane Doe (B.C.)'s trafficker(s) recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, and/or solicited Jane Doe (B.C.)

271.    Jane Doe (B.C.) was engaging in commercial sex acts at Days Inn Bradenton through force, threats of force, and/or coercion.

272.    Jane Doe (B.C.) was regularly beaten by her trafficker(s) and had visible injuries on her body while at Days Inn Bradenton.

273.    Jane Doe (B.C.)'s trafficker(s) used her drug addiction and the threat of causing her harm by becoming "dope sick" to threaten and coerce her to engage in commercial sex acts.

274.    All money made by Jane Doe (B.C.) from these commercial sex acts was given to her traffickers.

275. Trafficker 1, his associates, and Sakardev took part in a common undertaking or enterprise involving both risk and potential profit wherein Trafficker 1 and his associates ran a criminal sex trafficking and drug dealing operation out of Days Inn Bradenton and Traffickers 1 and Sakardev financially benefited from the same.

276. Sakardev knowingly received something of value by making money from the room rentals used for trafficking.

277. Trafficker 1 received something of value in that he received the proceeds of Jane Doe (B.C.)'s commercial sex acts, as well as received a "safe" venue to operate his venture without the risk of Days Inn Bradenton calling the police or forcing him to leave the premise.

278. Jane Doe (B.C.) received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

279. Sakardev knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 18 U.S.C. §§ 1591(a)(1).

280. Sakardev rented rooms as needed for commercial sex, despite the obvious signs of sex trafficking, and did not call the police on Trafficker 1 so as not to interfere with the ongoing venture while continuing to reap the profits from room rentals.

281. Sakardev's conduct has caused Jane Doe (B.C.) serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**WHEREFORE**, Plaintiff, Jane Doe (B.C.), demands judgment from Defendant, Sakardev, for compensatory damages, past and future damages,

reasonable attorney's fees, costs, and expenses of these proceedings, punitive damages, and such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Jane Doe (B.C.), hereby demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

Date: March 4, 2026                              Respectfully Submitted,

*/s/ Lisa D. Haba*
**Lisa D. Haba** (FBN: 077535)
**Maria E. Bryant** (FBN: 055332)
The Haba Law Firm, P.A.
1220 Commerce Park Dr., Ste. 207
Longwood, FL 32779
(844) 422-2529
lisahaba@habalaw.com
mariabryant@habalaw.com

*Attorneys for Plaintiff*